# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
MAY 03 2018
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)  Case No.  **18MJ2157**
Facebook, Inc. )
1601 California Avenue )
Palo Alto, California 94304 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Northern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. Section 1512 | Witness Tampering / Obstruction of Justice |

The application is based on these facts:

See attached affidavit of ICE OPR Special Agent Teresa Cardona

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Teresa Cardona, ICE OPR
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/3/2018

_____
*Judge's signature*

City and state: San Diego, CA          Honorable Ruben B. Brooks, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Teresa Cardona, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, Office of Professional Responsibility ("OPR") in San Diego, CA, and have been so employed for approximately 16 years. I primarily investigate crimes concerning employee corruption, bribery, false impersonation of federal officers, and various forms of employee misconduct.

2. My experience as an OPR Special Agent has included the investigation of cases involving the use of computers and the Internet to commit crimes. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer crimes, computer evidence identification, computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of search warrants involving the search and seizure of computer equipment.

3. This affidavit is in support of applications by the United States of America for search warrants for Facebook, Inc., 1601 California Avenue, Palo Alto, CA 94304, as described in Attachment A, to search the electronic communication accounts associated with:

1. Facebook user "queti.tj" and Facebook ID 100006326620328 (hereafter "FB-1");

2. Facebook user "diego.felix.9421" and Facebook ID 100018657881962 (hereafter "FB-2"); and

3. Facebook user "Carlos Lopez" and Facebook ID 100003368077841 (hereafter "FB-3")

from June 1, 2017, to the present, for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 18, United States Code, Section 1512, as described in Attachments B-1, B-2 and B-3.

4. The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of victims; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the applications for search warrants, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## STATEMENT OF PROBABLE CAUSE

### A.  Initiation Of Investigation

5. Martin Rene Duran ("Duran") is a former Supervisory Border Patrol Agent. Duran is charged in a multi-count Indictment with falsification of records with intent to impede, obstruct and influence the investigation and administration of a matter within the jurisdiction of the Department of Homeland Security, in violation of 18 U.S.C. § 1519, and deprivation of rights under color of law, in violation of 18 U.S.C. § 242. United States v. Duran, 15CR2818-H.

6. The Indictment alleges that, in 2013, Duran created false "lookout records" for "R.C." in the Treasury Enforcement Communications System (TECS) and that, while acting under color of law, Duran caused R.C. to be detained unjustifiably. Trial is set for September 11, 2018.[1]

7. "R.C." is Ricardo Cortez ("Cortez"). On April 28, 2013, Cortez, the biological father of a minor victim, reported the crime of child molestation to Mexican law enforcement in Tijuana, Mexico. Raymundo Estrada Figueroa ("Estrada") was

---

[1] The Indictment also charges co-defendant Raymundo Estrada Figueroa with aggravated sexual abuse of a child, travel with intent to engage in illicit sexual conduct and travel in foreign commerce to engage in illicit sexual conduct, in violation of 18 U.S.C. §§ 2241(c), 2423(b) and 2423 (c). The charges against Estrada Figueroa have been severed for trial.

identified as the individual who molested the minor. Estrada is Duran's brother-in-law; Duran is married to Estrada's sister. Estrada had been in an extramarital affair with the mother of the child he was accused of molesting.

8. On April 30, 2013, after Cortez reported Estrada's abuse to Mexican law enforcement, Duran began investigative queries of Cortez. This occurred after Cortez reported Estrada's conduct to Mexican authorities. Duran created TECS lookouts for Cortez on three occasions:

<u>May 22, 2013</u>

SUBJ ASSOC TO AUTO SHOP IN MX MANUFACTURES COMPARTMENTS FOR NARCO INFO RECEIVED SUBJ KNOWN TO CARRY FIREARMS IN MX/LIVING IN MX. CONDUCT 7PT INSPECTION CONTACT SBPA DURAN 24/7 @ 619-XXX-XXXX FOR FURTHER

<u>July 25, 2013</u>

SUBJ ASSOC TO TCO WITH RECENT THREATS TO CBP PERSONEL. SECONDARY AND CONDUCT 7PT INSPECTIONS CONTACT IMB 1ST DUTY PHONE 24/7 619-XXX-XXXX.

<u>July 30, 2013</u>

SUBJ ASSOC TO TCO WITH RECENT THREATS TO CBP PERSONEL. DO NOT SECONDARY BASED ON THIS ENTRY. IF ENCOUNTERED CONTACT IMB IST SUP 1st 619-XXX-XXXX AND ECJ INTEL 619-XXX-XXXX.

9. Based on these TECS lookouts, Cortez was detained at the San Ysidro Port of Entry on multiple occasions as he entered the United States from Mexico. On the first such occasion, May 27, 2013, Duran responded to the Port of Entry and interviewed Cortez. According to Cortez, Duran questioned him about the Mexican investigation of Estrada and informed Cortez that he could be arrested for providing "false" information to the Mexican authorities. According to Cortez, Duran also requested his

personal information, including his phone number and his family's home addresses in the United States and Mexico.

10. On or about June 13, 2013, Cortez came to the Homeland Security Investigations ("HSI") office in San Diego, CA and provided information about his encounter with Duran. The information was provided to me, and I called Cortez that same day. This was the initiation of the OPR investigation involving Duran.

## B. Duran Provides Information About The TECS Lookouts

11. On or about September 26, 2014, HSI agents interviewed Duran about the TECS lookouts he created for Cortez. According to Duran, he had received information from a source of information, later identified as Carlos Gonzalez, that Cortez was involved in illegal activities, including drug trafficking, firearms trafficking and alien smuggling. Duran stated that he created the TECS lookouts for Cortez based on the information provided by Gonzalez.[2]

12. On or about October 14, 2014, Duran arranged a meeting between HSI agents and Gonzalez, the source of information. During that meeting, Gonzalez provided information about a person known to him as "Rica" (short for Ricardo). According to Gonzalez, he had known "Rica" for approximately 10 years, and " Rica" was involved in drug trafficking. Gonzalez did not know Rica's last name. When HSI

---

[2] According to Border Patrol records, Gonzalez was a source of information utilized by Duran between approximately August 2013 and October 2015. Border Patrol records indicate Gonzalez received compensation during this time period. In addition, Gonzalez previously was a confidential informant for HSI between approximately October 2013 and February 2014. HSI records indicate that Gonzalez was not compensated by HSI. Gonzalez has no criminal history in the United States. During the time periods that he served as a source of information and a confidential source, I am informed that Gonzalez provided credible information and that he also provided information deemed not credible. In this case, Gonzalez was held in custody as a material witness from October 2015 until May 2017. Following his deposition, Gonzalez was removed to Mexico through the Otay Mesa Port of Entry on or about May 4, 2017. Agents gave Gonzalez $40 in U.S. currency so Gonzalez could buy food and pay for transportation to his home in Tecate, Mexico.

AFFIDAVIT IN SUPPORT OF APPLICATIONS
FOR SEARCH WARRANTS

4

Email Search Protocol_SLF_041813

agents showed Gonzalez a photograph of Cortez, Gonzalez responded that he did not recognize the individual depicted. Based on the information provided by Gonzalez and the fact that he did not identify Cortez as "Rica," agents concluded that "Rica" was not Cortez.

### C. Material Witness Deposition Of Gonzalez

13. On or about November 5, 2015, a grand jury returned an Indictment charging Duran with violations of 18 U.S.C. §§ 242 and 1519. On October 8, 2015, Gonzalez was arrested on a material witness complaint. On May 2, 2017, the parties deposed Gonzalez. He testified that he did not know Cortez and never provided Duran with information about Cortez. When shown a photograph of Cortez, Gonzalez stated that he did not recognize the individual depicted.

14. As noted in footnote 2 above, Gonzalez was returned to Mexico on May 4, 2017, following the deposition.

### D. Gonzalez Reports Facebook Messages From FB-1 and FB-2

15. On or about January 26, 2018, Gonzalez called me and informed me that he had received threatening communications via Facebook messenger. Gonzalez believed that Duran was making the threats because the statements referenced Gonzalez's time in custody as a material witness.

16. On or about January 30, 2018, I met with Gonzalez at the Otay Mesa Port of Entry. Gonzalez provided screen shots of Facebook messenger communications he had received from Facebook users "queti.tj" (FB-1) and "diego.felix.9421" (FB-2). Gonzalez also informed me that his account was Facebook user "Carlos Lopez" (FB-3). According to Gonzalez, he shut down the FB-3 account after receiving the threatening communications from "queti.tj" (FB-1) and "diego.felix.9421" (FB-2).

///
///
///
///

**Communications With FB-1**

17. I took photographs of the screenshots on Gonzalez's cellular phone depicting messages to and from FB-1.[3] The Facebook messenger communications between FB-1 and Gonzalez (FB-3) began in approximately June 2017 and continued to January 2018. The majority of the communications were social and friendly. Other communications pertained to Gonzalez's incarceration as a material witness. According to Gonzalez, he believed the FB-1 account was used by Duran or perhaps a Mexican law enforcement official working with Duran.

18. In one message from December 11, 2017, FB-1 states that "you were lost for months." [This appears to refer to Gonzalez being in custody as a material witness.] Gonzalez referred to his attorney calling him. [Gonzalez was represented by counsel as a material witness, a fact known to Duran because Duran and Gonzalez's counsel were both present at Gonzalez's May 2017 deposition.] Later in the Facebook messenger conversation, FB-1 stated: "Well watch it they might give you some more vacation time for years for helping!" ["Vacation time" refers to jail. Based on the context of this communication, FB-1 is telling Gonzalez that he could go back to jail for years if he cooperates in the case.]

**Communications With FB-2**

19. I also took photographs of the screenshots on Gonzalez's cellular phone depicting messages between FB-2 and Gonzalez (FB-3). The Facebook messenger communications between Gonzalez and FB-2 began in approximately January 2018. The communications from FB-2 to Gonzalez contained direct threats. For example, FB-2 stated, "Who dimed me out . . . Either way I'm going to cut you up . . . You are going to cry, faggot." FB-2 also stated, "when you are in the office I will know[.]" In

---

[3] Communications between Gonzalez and FB-1 and between Gonzalez and FB-2 were in the Spanish language. I speak Spanish, and this affidavit includes my translations of the communications.

a subsequent message, FB-2 informed Gonzalez, "when I get you stupid for what you are doing so you can catch the role."

20. Based on my training and experience, the phrase "in the office" is a Spanish slang phrase used in Tijuana that refers to cooperating with law enforcement. I have heard this phrase used in multiple cases to describe cooperation with law enforcement. Based on the context of these messages, FB-2 is stating that he/she knows Gonzalez is "cooperating" with law enforcement. This could refer to Gonzalez's status as a material witness in this case. It is also possible that FB-2 is referring to Gonzalez's cooperation in an unrelated matter given that Gonzalez has provided information to U.S. law enforcement in other investigations. However, I believe it is more likely that the communication refers to Gonzalez's material witness status in this case because Gonzalez has not provided information regarding other cases since approximately 2014.

### E. Duran Identified As The FB-1 User

21. On about March 8, 2018, Gonzalez informed me that he had opened a new Facebook account under the guise of a female and had "friended" FB-1 on March 3, 2018. According to Gonzalez, he had received photographs from FB-1 indicating that Duran was the FB-1 user. I instructed Gonzalez that he should leave the account open until I could meet with him and review the communications.

22. On or about March 28, 2018, I met with Gonzalez, and he showed me photographs he had received from FB-1 on March 7 and 12, 2018. Below are two of those photographs:




23. I have observed Duran on multiple occasions, including his post-arrest interview, the material witness deposition and multiple court hearings in this case. As such, I am familiar with Duran's appearance and can identify him as the male depicted in both photographs. I am also aware that Duran is currently employed as a nurse with Kaiser Permanente.

24. Given the evidence showing that Duran is the user of the FB-1 account, and the Facebook messenger communications from that account to Gonzalez (using the FB-3 account) regarding the possibility of "vacation time" for cooperating, I respectfully submit there is probable cause to believe that a search of the FB-1 account will reveal evidence of Duran's efforts to obstruct justice by attempting to dissuade Gonzalez from testifying in this case.

25. I am unaware of evidence linking Duran to the FB-2 account. However, given the evidence showing threats from the FB-2 account to Gonzalez (using the FB-3 account) and the FB-2 account's slang reference to Gonzalez's cooperation, I respectfully submit there is probable cause to believe that Duran or someone associated with him was using the FB-2 account to dissuade Gonzalez from testifying in this case.

## GENUINE RISKS OF DESTRUCTION OF EVIDENCE

26. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, if the subject receives advance warning of the execution of this warrant, there be a genuine risk of destruction of evidence.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

27. The United States has not attempted to obtain this data by other means.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

28. Facebook (hereafter, the ISP) is an Internet company that, among other things, provides electronic communication services to its subscribers. The ISP's electronic mail and messaging services allow subscribers to exchange electronic

communications with others through the Internet. The ISP's subscribers access its services through the Internet.

29. Subscribers to the ISP's electronic communication services use screen names and/or account names during their electronic communications. The screen names may or may not identify the real name of the person using a particular screen name. Although the ISP requires users to subscribe for a free account, they do not verify the information provided by the subscriber for their free services.

30. At the creation of a Facebook account and for each subsequent access to the account, the ISP logs the IP address of the computer accessing the account. An IP address is a unique address through which a computer connects to the Internet. IP addresses are leased to businesses and individuals by Internet Service Providers. Obtaining the IP addresses that have accessed a particular Facebook account often identifies the Internet Service Provider that owns and has leased that address to its customer. Subscriber information for that customer then can be obtained using appropriate legal process.

31. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of the ISP are not. It would be inappropriate and impractical for federal agents to search the vast computer network of the ISP for the relevant accounts and then to analyze the contents of those accounts on the premises of the ISP. The impact on the ISP's business would be disruptive and severe.

32. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the ISP accounts, as described in Attachments B-1, B-2 and B-3. In order to accomplish the objective of the search warrants with a minimum of interference with the business activities of the ISP, to protect the privacy of ISP subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, Immigration and Customs Enforcement seeks authorization to allow the ISP to make a

digital copy of the entire contents of the accounts subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachments B-1, B-2 and B-3. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

33. Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

34. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachments B-1, B-2 and B-3. The

personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

35. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account and any electronic communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

36. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## CONCLUSION

37. Based on the foregoing, there is probable cause to believe that the items identified in Attachments B-1, B-2 and B-3 have been used in the commission of a crime and constitute evidence of violations of Title 18, United States Code, §§ 1512 and 1519 and will be found in the items or at the premises to be searched as provided in Attachment A.

Teresa Cardona
Senior Special Agent
Immigration and Customs Enforcement
Office of Professional Responsibility

Subscribed and sworn to before me this 3rd day of May, 2018.

HONORABLE RUBEN B. BROOKS
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

Facebook is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1601 California Avenue, Palo Alto, California 94304.

## ATTACHMENT B-2

**I.** Service of Warrant

The officer executing the warrant shall permit Facebook (the ISP), as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.** Items subject to seizure from the ISP

All subscriber and/or user information, all electronic mail, messages, images, text messages, histories, buddy or friend lists, profiles, method of payment, detailed billing records, access logs, all information concerning page views of 3rd party websites which contain the 'Like' button or other Facebook social elements, transactional data, and any other files or records associated with the following account and user name(s):

**Facebook account for "diego.felix.9421" (Facebook ID 100018657881962)**

**III.** The search of the data supplied by the ISP pursuant to this warrant will be conducted by the Federal Bureau of Investigation as provided in the "Procedures For Electronically Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to the period of June 1, 2017 to the present and to seizure of:

   a. Communications, records, and attachments tending to discuss or suggest witness tampering or obstruction of justice;

   b. Communications, records, and attachments tending to identify the user(s) of the subject Facebook account, and any co-conspirators involved in the activities in III(a) above; and

   c. Communications, records, and attachments that provide context to any communications or records described above, such as messages sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the subject account;

**which are evidence of violations of 18 U.S.C. § 1512.**